TH/EEA
F. #2014R01255

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

      - against -

JOSE MIGUEL MELENDEZ-ROJAS,           Docket No. 17-CR-434 (S-2) (ARR)
      also known as "Gueramex," "Gueracasa"
      and "Jose Melendez Perez,"
JOSE OSVALDO MELENDEZ-ROJAS,
ROSALIO MELENDEZ-ROJAS,
      also known as "Leonel," "Wacho" and
      "El Guacho,"
FRANCISCO MELENDEZ-PEREZ,
      also known as "Paco" and "el Mojarra,"
FABIAN REYES-ROJAS and
ABEL ROMERO-MELENDEZ,
      also known as "La Borrega" and "Borrego,"

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -X


SENTENCING MEMORANDUM


           BREON PEACE
           UNITED STATES ATTORNEY
           Eastern District of New York
           271 Cadman Plaza East
           Brooklyn, New York 11201

Tanya Hajjar
Erin E. Argo
Gillian A. Kassner
Assistant U.S. Attorneys
      (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in advance of the sentencings of defendants Jose Miguel Melendez-Rojas, Jose Osvaldo Melendez-Rojas, Rosalio Melendez-Rojas, Francisco Melendez-Perez, Abel Romero-Melendez, and Fabian Reyes-Rojas.

The sentences imposed on the defendants should reflect the extraordinary psychological and physical damage they have inflicted upon their victims.  The Court should adopt the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") calculation detailed in the Presentence Investigation Report ("PSR") and recitation of the relevant facts. The government respectfully submits that the applicable Guidelines range and the relevant factors under 18 U.S.C. § 3553(a) warrant sentences of life imprisonment for Jose Miguel Melendez-Rojas, Jose Osvaldo Melendez-Rojas and Rosalio Melendez-Rojas, sentences of 420 months for Francisco Melendez-Perez and Abel Romero-Melendez, and a sentence of 180 months for Fabian Reyes-Rojas.  The Court should also order payment of restitution.

FACTUAL BACKGROUND

The Court is familiar with the offense conduct in this case, having presided over the two-week jury trial in March 2020.  The following factual summary is intended to provide an overview sufficient to situate the government's arguments with respect to sentencing in the relevant factual context, but not to provide a comprehensive recitation of all aspects of the offense conduct proven at trial.

As detailed in the PSRs, the defendants in this case, who were members of an extended family known the Melendez-Rojas trafficking organization ("MR-TO"), transported women, some of whom were minors, to the United States to work in prostitution, and used fraud, physical violence and threats to coerce the women to work in prostitution. The defendants used false promises of love, marriage, and a better life to lure young and vulnerable Mexican women and girls into romantic and sexual relationships and isolated their victims from their families by bringing them to live with them at the defendants' homes in Tenancingo, Mexico.  The defendants then used brutal beatings, threats of violence, forced abortions and psychological manipulation to compel their victims to prostitute, and financially benefitted from the proceeds generated from that prostitution.  See Jose Miguel Melendez-Rojas Pre-Sentence Investigation Report ("Jose Miguel PSR") ¶¶ 13-16.[1]  The trafficking conduct underlying the offenses of conviction involved six primary victims, Jane Does #1 through #6.

---

[1]     For expediency, in discussing the background facts and offense conduct, this memorandum primarily cites to the PSR for Jose Miguel Melendez-Rojas, the first-listed defendant on the indictment, rather than the PSRs for all six defendants, as the offense conduct is similarly described in the individual defendants' PSRs.

I.      Victims of the Melendez-Rojas Trafficking Organization

The evidence presented at trial demonstrated that for over a decade, the defendants smuggled women, some of whom were minors, into the United States and then used physical and sexual violence, threats, and fraud to coerce them to work in prostitution. Six victim-witnesses testified at trial regarding brutal beatings, threats of violence, forced abortions, and psychological manipulation they endured at the hands of the defendants.

i.      Diana (Jane Doe #1)

Diana met Jose Miguel Melendez-Rojas ("Jose Miguel MR")[2] in a clothing store in Mexico where she worked in approximately January 2006, when she was sixteen years old.  Jose Miguel MR PSR ¶¶ 17-26.  Over the next few months, Jose Miguel MR regularly visited Diana at the clothing store.  Id.  Diana then took Jose Miguel MR to meet her family, who were concerned about the relationship because Jose Miguel MR was so much older.  Jose Miguel MR's parents also met Diana's family and assured them that Jose Miguel MR would take care of her.  Id.

Shortly after Jose Miguel MR met her family, Diana traveled with him to meet his family in Tenancingo, Mexico.  Id.  Jose Miguel MR began a sexual relationship with Diana that night.  At the time, Diana was 16 years old and Jose Miguel MR was nearly 30 years old.  Id.

Jose Miguel MR told Diana that he was arranging for them to travel to the United States.  Id.  Jose Miguel MR told Diana that he would arrange for her to work in a

---

[2]      The government refers to the defendants by their first names to avoid confusion, given that the defendants in this case share the same or similar last names.

restaurant and then, after two years and once Diana was of age, they would return to Mexico and get married.  Id.

        Jose Miguel MR and Diana, along with Jose Miguel MR's cousin, Abel Romero-Melendez ("Abel RM"), attempted to cross the border multiple times in July 2006. Id.; see Trial Transcript ("Tr.") at 1329-40 (Diana's testimony). Jose Miguel MR obtained documents that falsely identified Diana's birth year as 1987, making her appear older.  Jose Miguel MR told Diana she was to use that date of birth if they encountered police.  Jose Miguel PSR ¶ 20.  Jose Miguel MR and Abel RM told Diana to repeat her false date of birth multiple times; when she accidentally gave her true date of birth, Abel RM told Diana she was "wrong" and corrected her.  Trial Tr. 1240.

        Eventually, Jose Miguel MR and Diana succeeded in crossing the border.  Jose Miguel PSR ¶ 21.  They eventually arrived in Las Vegas, Nevada, where they took a flight to New York City.  Rosalio Melendez-Rojas ("Rosalio MR"), Jose Miguel MR's brother, met them in New York.  After arriving in New York, Diana lived in an apartment in Queens, New York with Jose Miguel MR, Rosalio MR, and another woman ("Karina")[3] who worked as a prostitute for Rosalio MR.  Karina told Diana that Diana would be working as a prostitute.  Diana refused, and Jose Miguel MR told her that the "time had come" for her "to pay what he had invested in her," and if she refused, Jose Miguel MR would kill her brothers.  Diana still refused, and Jose Miguel MR punched her in the mouth.  Trial Tr. 1256. Diana was forced to work as a prostitute.

---

       [3]    "Karina" is referred to as Jane Doe #7 in the PSR.  Fabiola referred to Karina by her true name, Elizabeth, during her testimony.  Jose Miguel PSR ¶ 78.

Karina instructed Diana on how much to charge clients and how much time to spend with them. Jose Miguel PSR ¶ 23. Diana was forced to work in New York, New Jersey, Maryland, and Connecticut. Every day, Jose Miguel MR would give her condoms as she left the apartment and count what remained at the end of the night. She generally worked every day from 7 p.m. to 2 a.m. and would meet with approximately twenty clients per shift, and would give Jose Miguel MR the money she earned. Jose Miguel MR searched her to ensure she was not hiding any money. Id.

After a short time, Abel RM and another woman (referred to during trial as "Estephanie" and her true name, "Cristina"[4]) who worked as a prostitute for Abel RM, began to live with them in the same apartment. See Trial Tr. at 1262 (Diana's testimony). On one occasion, Diana overheard a conversation in which Jose Miguel MR, Abel RM and Rosalio MR bragged about which of them had the youngest girl. Diana witnessed Rosalio MR physically and sexually assault Karina.

While she was a minor and forced to work as a prostitute for the defendants, Diana was "punished" through brutal physical and sexual abuse in front of the other occupants of the residence, including Rosalio MR and Abel RM. Trial Tr. 1261-62, 1274 (Diana's testimony describing rape, being burned by a candle and cut with broken glass). Diana also testified that she was raped after her attempts to escape:

Q:          Did either Miguel or Rosalio say anything to you?

DIANA:    That I was going to pay for that as soon as we got home.

---

[4]        Estephanie/Cristina is referred to as Jane Doe #8 in the PSR. Jose Miguel PSR ¶ 79.

| Q: | Did something happen to you when you got home? |
|---|---|
| | (Pause.) |
| DIANA: | Yes. |
| Q: | What happened? |
| | (Pause.) |
| DIANA: | He beat me and he raped me and everybody watched. |
| Q: | Everybody in the house? |
| DIANA: | Yes. |

Trial Tr. 1277-78.  Diana tried to escape from Jose Miguel MR multiple times.  The first three times, she failed and Jose Miguel MR physically assaulted her and threatened to kill her brothers as punishment.  Later, Diana became friends with another woman, who offered to let Diana babysit her son.  In approximately December 2006 or January 2007, the woman got Diana a small room in an apartment in New York City, and this allowed Diana to escape from Jose Miguel MR.  After Diana left, Jose Miguel MR continued to send her threatening messages.  Jose Miguel PSR ¶ 26.

ii.   Jane Doe #2 (Veronica)

Veronica met Jose Miguel MR in approximately December 2007, when she was about 19 years old, while she was working at a restaurant in her hometown in Mexico. Jose Miguel MR PSR ¶¶ 27-33.  Jose Miguel MR and Veronica began to see each other socially, and when Veronica's mother became very sick, Jose Miguel MR loaned her money to help pay for her mother's medical bills.  Id.  Jose Miguel MR told Veronica that his brother "Tiburon" worked at a restaurant in the United States and that he could get her a job

at the restaurant.  Id.  Veronica agreed to accompany Jose Miguel MR to the United States.

Rather that leaving right away, Jose Miguel MR took Veronica to his hometown in

Tenancingo.  Id. The relationship between Veronica and Miguel MR became romantic and

more serious.  Id.  While Veronica lived in his house, Jose Miguel MR left Veronica in his

house alone and locked her in the house during the day.  Id.  Jose Miguel MR also monitored

Veronica's limited communications with her mother and held onto a copy of her birth

certificate.  Id.

       After approximately a month in Jose Miguel MR's house, Jose Miguel MR

made arrangements to smuggle Veronica to the United States.  After successfully crossing

the border, Veronica was transported to Queens, New York.  After they arrived in New York,

Jose Miguel MR told Veronica that she would have to work in prostitution.  Veronica did not

initially understand what he meant, so Jose Miguel MR explained it.  Veronica initially

refused, but Jose Miguel MR did not give her an option.  In her trial testimony, Veronica

explained: "It wasn't a conversation. He told me that if I didn't work in prostitution, he was

going to hurt my family with threats." Trial Tr. 1384.  Veronica believed Miguel MR may

hurt her daughters or her mother because Jose Miguel MR knew where they lived, and

Veronica did not speak English, was unable to read, and did not know anyone in New York

who could help her.  Jose Miguel PSR ¶28; Trial Tr. 1386.  Out of fear for what Jose Miguel

MR and his family would do to her family, Veronica began working in prostitution.  Id.;

Trial Tr. 1385.

       While working in prostitution, Veronica gave half of her earnings to the driver

who delivered her to prostitution clients and the other half to Jose Miguel MR.  Jose Miguel

PSR ¶ 29.  Jose Miguel MR ensured that Veronica kept none of her proceeds from

prostitution and would search her for money.  Id.  After Veronica told Jose Miguel MR that

she did not want to work in prostitution anymore, Jose Miguel MR threatened her and told

her that if she "didn't accept what he was asking" of her, "he would chop [her] mother up

into little pieces."  Trial Tr. 1389.

On at least one occasion, Jose Miguel MR hit her across the face, leaving a

bruise.  Jose Miguel PSR ¶ 29.  Rosalio MR also threatened Veronica, telling her that if she

reported Jose Miguel MR to the police, they would send someone to kill her family.  Id.

Jose Miguel MR forced Veronica to work as a prostitute in shifts, from 7 a.m.

or 10 a.m. to 7 p.m., and at times also from 7 p.m. to 3 or 4 a.m., seven days a week,

including during her menstrual cycle.  Jose Miguel PSR ¶ 30.  Once, Veronica's legs became

numb and she could not walk.  Jose Miguel PSR ¶ 31.  Jose Miguel MR took Veronica to the

hospital, where she was checked in under a false name.  Id.  Veronica was supposed to return

for additional tests but never went back because Jose Miguel MR forced Veronica to return

to working as a prostitute.  Id.  To date, Veronica continues to suffer episodes where her legs

go numb and she suffers cramping pains.  Id.

Jose Miguel MR returned to Mexico in approximately 2011.  Jose Miguel PSR

¶ 32.  While he was gone, Jose Miguel MR's relatives, including Rosalio MR and Jose

Osvaldo Melendez-Rojas ("Jose Osvaldo MR"), would sometimes take money from

Veronica and send it by wire service to Jose Miguel MR in Mexico.  Id.  Other times,

Rosalio MR and Jose Osvaldo MR and other relatives would take Veronica to a money

remitter and fill out the form for her, using a false name so she could send her proceeds from

prostitution to Mexico.  Id.

While in Mexico, Jose Miguel MR would go to Veronica's hometown and call Veronica from her mother's house.  Jose Miguel PSR ¶ 33.  Later, Jose Osvaldo MR took Veronica's sister.  Id.  Veronica called Jose Osvaldo MR and Jose Miguel MR and threatened that if they did not return her sister, she would call the police and file a complaint, after which Jose Osvaldo MR returned Veronica's sister to her home.  Id.  Veronica finally escaped in approximately 2013.  Id.

      iii.    Fabiola (Jane Doe #3)

Fabiola met Rosalio MR in a nightclub in Mexico City, Mexico in 2009, when she was approximately 20 years old.  Rosalio MR then asked Fabiola to meet his family and she agreed.  Rosalio MR told Fabiola that he was from Puebla, Mexico, but he in fact took Fabiola to a house in Tenancingo that was under construction.  Rosalio MR told Fabiola that they would be traveling to the United States to work in a restaurant together, and eventually they would return to their home in Mexico.  Jose Miguel PSR ¶ 34.

For the next two or three months, Rosalio MR left Fabiola alone in the house in Tenancingo for long periods of time and told her not to go outside.  Rosalio MR eventually arranged for her and another girl, Elizabeth, whom he claimed was his cousin, to be smuggled into the United States.  Rosalio MR told Fabiola he would come to the United States later.  Id. ¶ 35.

After multiple attempts, in approximately 2009, Fabiola and Elizabeth made it across the border and traveled to the residence of Rosalio MR's brother, Jose Osvaldo MR, in Queens, New York.  Trial Tr. 640-42.  Shortly after she arrived, Fabiola spoke with Rosalio MR by telephone and he told her that she was going to be working as a prostitute.

When she objected, Rosalio MR told her that she "had to do it" and threatened to "do something" to her family if she refused.  Trial Tr. 642.

Elizabeth told Fabiola that Fabiola was "really stupid" for believing Rosalio MR's promises of a future with her, and Fabiola "felt destroyed."  Trial Tr. 643.  Elizabeth explained to Fabiola how to work as a prostitute.  Elizabeth also made arrangements for Fabiola to go with a delivery driver, who would take her to clients.  Later that same day, Fabiola began working as a prostitute.  The first day, she had sex with approximately fifteen clients, and she gave all the money she earned to Jose Osvaldo MR.  Trial Tr. 645.  Fabiola continued to be forced to work as a prostitute.  During the time she was working for Rosalio MR in prostitution, Fabiola was driven by other individuals to clients in New York, New Jersey, Connecticut, and Pennsylvania.   Jose Miguel PSR ¶ 37.

In approximately September 2009, Rosalio MR arrived in the United States and he and Fabiola moved to another apartment.  Also during this time, Fabiola became pregnant with Rosalio MR's baby.  Rosalio MR told Fabiola that it was not the right time for a baby, and that she had to continue working as a prostitute, so she would have to have an abortion.  Fabiola pleaded with Rosalio MR to let her keep the baby, and he eventually told her that he wanted the baby too.  Jose Miguel PSR ¶ 38

Rosalio MR gave Fabiola pills that he claimed were folic acid pills and told her to take them.  The pills were in packaging that read, "Folic Acid."  Trial Tr. 654.  Shortly after Fabiola took the pills, she started to bleed vaginally.  She felt significant pain and was taken to the emergency room.  Fabiola miscarried.  Rosalio MR later admitted that the pills he had given her caused the loss of the baby.  Id.

In approximately 2012, Rosalio MR returned to Mexico with Elizabeth, but Rosalio MR remained in contact with Fabiola and demanded that she continue to send him money that she had earned in prostitution. Jose Miguel PSR ¶ 39. She sent money she earned from prostitution to Rosalio MR in Mexico via wire transfers. During the time that Fabiola was working in prostitution, she learned that Rosalio MR had three other women working for him. Fabiola finally escaped from Rosalio MR in late 2015.

      iv.    Jane Doe #4 (Maria Rosalba)

Maria Rosalba met Jose Osvaldo MR in approximately April or May 2010, when she was 19 years old, while waiting for a bus in Mexico. Jose Miguel PSR ¶¶ 40-55. Thereafter, they began meeting in a park when she would get off from work. Id. Jose Osvaldo MR eventually asked Maria Rosalba to be his girlfriend, and she agreed. Id.

Each time Maria Rosalba and Jose Osvaldo MR would meet up, he brought along Francisco Melendez-Perez ("Francisco MP"). Id. Jose Osvaldo MR asked Maria Rosalba if she had a friend that she could introduce to Francisco MP. Id. Maria Rosalba introduced Francisco MP to her coworker, Delia. Id. Thereafter, Francisco MP and Delia also began dating. Id.

Later in May 2010, Jose Osvaldo MR told Maria Rosalba that he wanted to introduce her to his parents. Id. Maria Rosalba agreed and traveled with him to Tenancingo to meet his family. Id. At his parents' house, she saw Francisco MP, at which point Jose Osvaldo MR admitted that Francisco MP was his nephew, not his friend. After visiting his parents' home, Jose Osvaldo MR drove her to another house with almost no furniture, where they had sex. Id. After, Jose Osvaldo MR then drove her home and they continued to see each other. Id.

A few days later, Jose Osvaldo MR and Francisco MP invited Jane Doe #4 and Delia to a party in their village.  Id.  When they arrived there, however, there was no party.  Id.  Jose Osvaldo MR took Maria Rosalba to the sparsely furnished house again and refused to bring her home.  Maria testified, "he knew that I was leaving the next day, Saturday, to go to Cancun to be with my brother. And then he ruined my plans. I never went back home."  Trial Tr. 403.  For several days, Jose Osvaldo would not allow Maria Rosalba to call her family.  Jose Miguel PSR ¶ 43.  When he finally allowed Maria Rosalba to call her parents, he stood next to her, listening to the conversation.  Id.  Maria Rosalba continued to live with Jose Osvaldo MR in his hometown.  Id.

In approximately June 2010, Maria Rosalba, Jose Osvaldo MR, Francisco MP, Delia, a young female child and Jose Osvaldo MR's mother went to see Maria Rosalba's parents.  Jose Miguel PSR ¶ 44.  On the way, they picked up a fruit basket and tequila that Jose Osvaldo MR gave her parents as a gift.  Id.  After Maria Rosalba's parents agreed to let her live with Jose Osvaldo MR, they also paid a visit to Delia's house, where Maria Rosalba witnessed Francisco MP give Delia's parents money in addition to a fruit basket.  Id.  They then all returned to Jose Osvaldo MR's parents' home.  Id.  Jose Osvaldo MR told Maria Rosalba that they would live together and eventually get married and have a family together.  Id.  Thereafter, Jose Osvaldo MR would go out and leave her alone in the house all day.  Id.  She was unable to leave because she did not know where she was and had no money.  Whenever Jose Osvaldo was not around, Francisco MP would watch over her and report to Jose Osvaldo MR about everything she did.  Id.

Jose Osvaldo MR took Maria Rosalba to Tenancingo's city hall to get an identification card.  While there, Jose Osvaldo MR greeted the mayor of Tenancingo like they were old friends and offered to change Maria Rosalba's date of birth.

> Q.        What, if anything, did you realize about Jose Osvaldo and the president of Tenancingo?
>
> MARIA:    That they were friends; that he had the power to order him; that he could tell the president to do what Jose Osvaldo wanted him to do.

Trial Tr. 420.  While Maria Rosalba was living with Jose Osvaldo MR, he took her to a store and bought her makeup, lingerie, and high heels.  Jose Miguel PSR ¶ 46.  They then traveled to Mexico City with a man and a woman, who took them to a hotel to change and then to a market.  Id.  At the market, Maria Rosalba was told how much to charge for sex and was instructed to speak with a woman about working in the sex trade.  Id.  Maria Rosalba did so, but that woman did not want people from Tenancingo working at the market and so would not let Maria Rosalba work there.  Id.  When they later returned home, Maria Rosalba testified that Jose Osvaldo MR "beat me. He forbid me from eating. He would curse at me all the time. They all made fun of me the way I looked . . . [h]e beat me in the ribs, he kicked me, smacks in the face."  Trial Tr. 433-34.

In approximately September 2010, Jose Osvaldo MR and Maria Rosalba got into an argument when she saw him kissing another girl at a party.  Id.  Once they got home, Jose Osvaldo MR raped her.  The next day, Maria Rosalba told Jose Osvaldo MR's mother about what had happened.  Id.  When Jose Osvaldo MR found out, he took her home and hit her in the face and kicked her in the ribs.  Id.  He degraded and insulted her.

> Q:        How did he insult you?

> MARIA:    He would tell me things like that no one cared about me;
> that I was an idiot; that I was garbage; that I was worthless.

Trial Tr. 438.

In approximately October 2010, Maria Rosalba believed that she was pregnant.  Jose Miguel PSR ¶¶ 48.  Jose Osvaldo MR took Maria Rosalba to a woman who gave her pills and inserted them into her vagina and told her to drink a liquid that tasted like chocolate with something bitter in it.  Id.  Jose Osvaldo MR slapped Maria Rosalba several times to force her to drink the liquid.  Id.  Later, Jose Osvaldo MR and Jose Osvaldo MR's mother gave Maria Rosalba the same drink and required her to insert more pills into her vagina, but her period still did not come.  Id.  Jose Osvaldo MR took Maria Rosalba to a doctor who made her take pills and insert pills into her vagina.  Id.  When her period still did not come, Jose Osvaldo MR took her back to the doctor, who sedated her.  Id.  When she awoke, she was bleeding from her vagina.  Maria Rosalba later learned she had had an abortion without her consent.  Id.; Trial Tr. 439-40.

Maria Rosalba did not go to the police after this incident because she knew that Jose Osvaldo MR and his family had a corrupt relationship with the police, as the police would warn his family about upcoming raids for contraband in town. Id.; Trial Tr. 441-42.

After Jose Osvaldo MR had Maria Rosalba have an abortion, he told Maria Rosalba that she would have to go to the United States with his sister so Maria Rosalba could work in an African market.  Jose Miguel PSR ¶ 49; Tr. 443.  Beginning in approximately October 2010, Maria Rosalba, Jose Osvaldo MR's sister Guadalupe Melendez-Rojas (hereinafter "Guadalupe MR"), Delia and Francisco MP tried to enter the United States three times, but failed each time and returned to Mexico.  Jose Miguel PSR ¶ 49.

After they returned from their last failed border crossing attempt, Guadalupe told Jose Osvaldo MR that Maria Rosalba was flirting with another man in the group.  Jose Osvaldo MR got angry and forced Maria Rosalba to get on her knees and apologize to his entire family.  Jose Miguel PSR ¶ 50.

In approximately November 2010, Jose Osvaldo MR told Maria Rosalba that he would travel with her and that she would work at the African market in the United States for a year.  Jose Miguel PSR ¶ 51.  That same month, Maria Rosalba and Jose Osvaldo MR successfully crossed the border into the United States.  After they crossed the border, they spent the night in the desert.  Id.  That night, Jose Osvaldo MR raped her.  Trial Tr. 455.  The following day, they were smuggled to Arizona and driven to Chicago, and then New York City.  Upon arrival in New York City, Maria Rosalba and Jose Osvaldo MR were met by Rosalio MR, and after one night, went to a home in Queens where other girls resided, including Jose Osvaldo's sister, Guadalupe MR.  A few days later, Jose Osvaldo MR rented an apartment where he and Maria Rosalba stayed.  Jose Miguel PSR ¶ 51.

Shortly after arriving in the United States, Jose Osvaldo MR and Guadalupe MR told Maria Rosalba that she would be working with Guadalupe MR and the other girls as a prostitute.  Trial Tr. 458-59.  Jose Osvaldo MR told Maria Rosalba that she had no rights and no family in the United States and her family back in Mexico did not want her.  Id.; 459-60.  He told her she had no choice and had to work off the smuggling fee that was paid to get her into the United States.  Jose Miguel PSR ¶ 52; Tr. 466.  Guadalupe MR gave her lubricant, condoms, and telephone numbers to call drivers who would bring her to prostitution clients.  Tr. 459.  Jose Osvaldo MR and Guadalupe MR told her to use an assumed name and that her name would be "Nancy."  Id.  Guadalupe MR also taught Maria

Rosalba how to use a condom and how to perform oral sex on clients.  Id.  Jose Osvaldo MR

told Maria Rosalba that if she went to the police they would arrest her.  Trial Tr. 459-60; Jose

Miguel PSR ¶ 52.  Jose Osvaldo MR and Guadalupe MR gave Maria Rosalba a phone and

told her it could only be used for work.  They also told her to charge $35 for fifteen minutes

of sex, and that if a customer wanted to have anal sex, Maria Rosalba would have to comply

and should charge $200.  Id.  Jose Osvaldo MR prepared condoms for Maria Rosalba to take

with her on her shift by opening one condom and placing an additional 20 condoms inside it.

Id.  Condoms were referred to as "chocolates."  Jose Osvaldo MR also forced Maria Rosalba

to take birth control pills.  Id.

       After Maria Rosalba began working as a prostitute, Jose Osvaldo MR

demanded that she give him everything left from each shift after paying the driver so that he

could pay for their smuggling fees and basic necessities.  Jose Miguel PSR ¶ 53; Tr. 466.

Jose Osvaldo MR would usually give her 20 condoms per shift and he required her to work

six or seven days per week.  She sometimes worked double shifts that required her to work

from 9 a.m. to 6 p.m. and then the second shift began at 7 p.m.  Id.  Occasionally, she would

work in New Jersey and Connecticut.  When she traveled to those states, she sometimes

worked out of individuals' homes that were used as brothels.  Jose Osvaldo MR told Maria

Rosalba to never talk about her life or about him to any delivery drivers.  He threatened to

beat her if she spoke to the drivers about him.  Id.

       On one occasion, while working in Connecticut, a client surprised Maria

Rosalba by penetrating her anally.  Jose Miguel PSR ¶ 54.  Maria Rosalba tried to push him

off, but he did not release her, causing Maria Rosalba significant pain.  Id.  The client threw

$5 at her and told her she was a whore and was worthless.  That day, Jose Osvaldo MR took

her earnings as usual and told Maria Rosalba to keep working instead of crying.  Id.  She told

Jose Osvaldo MR that she did not want to work in prostitution anymore, but he told her that

she had to keep on working and should have charged the man more for penetrating her

anally.  Id.

   In approximately December 2011, Jose Osvaldo MR returned to Mexico and

Maria Rosalba stayed in the United States to work in prostitution.  Jose Miguel PSR ¶ 55.

Maria Rosalba convinced Jose Osvaldo MR that she would continue to work in prostitution

for him so he would leave.  Id.  After he returned to Mexico, Jose Osvaldo MR would call

Maria Rosalba and ask for money.  Maria Rosalba sent Jose Osvaldo MR money through

Western Union transfers using the assumed name "Nancy."  Id.; Trial Tr. 511.  Maria

Rosalba continued to work for Jose Osvaldo MR for approximately three months after he

returned to Mexico.  Jose Miguel PSR ¶ 55.  While Jose Osvaldo MR was in Mexico, Maria

Rosalba learned from delivery drivers and her mother how to get in contact with a cousin

who lived in the United States.  Maria Rosalba then got in contact with her cousin and

changed her phone number so that Jose Osvaldo MR could not contact her.  Id.

   v. Delia (Jane Doe #5)

   Delia met Francisco MP in approximately April 2010, when she was 13 years

old, in a park in Tecamachalco, Mexico.  Jose Miguel PSR ¶¶ 56-66.  Her co-worker at an

ice cream shop, Maria Rosalba (Jane Doe #4), introduced Delia to Francisco MP, who Maria

Rosalba believed was a friend of her boyfriend, Jose Osvaldo MR.  Id.  At that time, Delia

told Francisco MP that she was 16 years old, like him.  They began seeing each other.  Id.  A

short time later, Delia turned 14 and Francisco MP asked her to accompany him to his

hometown to meet his family.  Id.  They traveled together with Jose Osvaldo and Delia.

While they were in the car on the way to Francisco MP's hometown, Delia told them she was 14 years old.  Id.  After they arrived that evening, Francisco MP asked her to stay the night and Delia agreed.  That night, Francisco MP and Delia had sex, during which he penetrated her anally.  This was very painful for Delia and it caused her to bleed.  Id.  That next morning, Delia met Francisco MP's mother.  Delia told her name and how old she was. Delia moved in with Francisco MP at his residence in Tenancingo, Mexico.  Id.  After Delia had a phone call with her mother in which her mother said she did not have a daughter, Francisco MP, Jose Osvaldo MR (Francisco MP's uncle), and Francisco MP's mother traveled to Delia's hometown to reassure her parents that she and Francisco MP were in a relationship and that his family would take care of her.  Francisco MP also brought a fruit basket and alcohol to Delia's mother.  Jose Osvaldo MR provided the same for Maria Rosalba's parents on this same trip. Id.

While Delia was staying with Francisco MP and his family, Maria Rosalba was staying with Jose Osvaldo.  Delia overheard a conversation between Jose Osvaldo MR, his mother, Guadalupe MR and Francisco MP about how Jose Osvaldo had made Maria Rosalba "lose her puppies."  Id.  He was laughing and joking about this.  Through the course of the conversation, Delia learned that Jose Osvaldo MR had forced Maria Rosalba to have an abortion.  Id.

Some time later, Delia and Francisco MP made another trip to see Delia's family, at which time Francisco MP requested Jane Doe's identification documents from her parents.  Id.  He told Delia that he needed the documents so that they could travel to the United States together.  Francisco MP informed Delia that they were going to travel to the United States to find work, but he did not specify what type of work.  Id.  Delia agreed to

18

travel to the United States, in part, because she wanted to escape from family members who had inflicted serious harm on her.  Id.  Francisco MP, together with other members of the MR-TO, subsequently hired smugglers, known as "coyotes" to smuggle Delia, Francisco MP, and Guadalupe MR (Francisco MP's aunt), into the United States.  Id.  Their first two border crossing attempts occurred in approximately July 2010.  United States Border Patrol agents intercepted the three of them  at the border and they were returned to Mexico both times.  Id.  Prior to being stopped at the border, Francisco MP and Guadalupe MR told Delia that she should shut up and that they would do the talking for her.  Id.   Guadalupe MR also gave authorities a false name and birth date for Delia.  At the end of October 2010, the three successfully crossed the border into Arizona and were transported to New York City, New York, by coyotes.  Id.

Francisco MP's other uncles, Rosalio MR and Jose Miguel MR, met them and paid the coyotes an additional amount for their transportation.  Id.  Rosalio MR and Jose Miguel MR picked them up in a car, and a driver transported them to Queens, New York. Delia and Francisco MP thereafter moved into an apartment (herein referred to as "the Queens residence") in Queens, with, among others, Rosalio MR and two women, including Fabiola.  Shortly after arriving in New York, Francisco MP and Rosalio MR informed Delia that she would have to work as a prostitute.  Delia initially refused to work as a prostitute, but Francisco MP repeatedly told her that, because she did not speak English or have any papers to work legally, she would have to work as a prostitute.  Prior to her relationship with Francisco MP, Delia had never had sex before.   Francisco MP also threatened Delia that, if she ran away, she would be arrested and if she did not agree to be a prostitute he would kill her family.

19

| Q: | How did you react? |
|---|---|
| DELIA: | It was hard for me to hear that someone could go and kill my family. And I knew that Francisco knew where my family lived and his family knew because Francisco's uncle José Osvaldo went there as well. So they knew where my family lived and I didn't want my family to be hurt. |
| Q: | So what happened at that point? |
| DELIA: | At that point I felt as a young girl who is 14 years old, that I have no option, and I had to accept that. |

Trial Tr. 740.

Rosalio MR and Fabiola taught Delia how to be a prostitute, including how to put a condom on a client, and Rosalio MR gave Delia a phone and a book with phone numbers for drivers who would take her to prostitution clients. Jose Miguel PSR ¶61. Rosalio MR instructed Delia that the phone was only for work and that she should give a false name and date of birth if she was arrested by police, as she was only 14 years old at the time. Id.

On her first shift, Guadalupe MR accompanied Delia to Staten Island and then went with a different delivery driver. Trial Tr. 784. With the first client, the condom broke. Trial Tr. 785. Delia went to the bathroom and called Francisco. He and Rosalio got on the phone and told her to use her fingers and some water to clean herself out. Trial Tr. 785-86. They then instructed her to continue working. She saw approximately 20 clients that shift. Afterwards, she was very sore. Trial Tr. 786. After her first shift, Francisco put aloe on her vagina and told her she had to continue working in prostitution because they had debts to pay off and if she refused, he would kill her family. Trial Tr. 786-87.

20

Typically, Delia had sex with approximately twenty clients or more per shift and she often worked double shifts.  Jose Miguel PSR ¶62.  Fabiola and Rosalio instructed Delia to charge clients $35 for 15 minutes of sex, and that she was to hand the money to the delivery driver after each client.  Id.  Sometimes drivers would refuse to take Delia for a shift because she appeared to be so young.  At the end of the day, the driver would split the money with Delia.  Id.  Francisco MP took the money that Delia earned working in prostitution, and also often counted the number of condoms that Delia had used during a given shift to ensure that the number of condoms that Delia had used matched the amount of money he received.  Francisco MP also insisted that Delia work even when she was sick and during her menstrual cycle.  Id.  Sometimes Delia was taken to a brothel in Delaware to work and also worked in delivery prostitution in Philadelphia, Pennsylvania.  Delia would arrange her schedule for each week and would sometimes write her schedule in a notebook. Id.  Francisco MP would keep track of the money she earned and would also sometimes write those calculations in a notebook.  Id.

In approximately December 2011, Francisco MP returned to Mexico with Rosalio MR.  Jose Miguel PSR ¶ 63.  During this time, Delia tried to work less.  Francisco MP would call her and threaten her to get her to work more.  Id.  He told her that if she did not, he would bring her younger sister back to the United States to work in prostitution.  He also instructed Delia to wire her prostitution earnings to him and his family members in Mexico, which she did.  Id.  Francisco MP returned to the United States in approximately May or June 2012.  Id.

In the summer of 2013, Francisco MP learned that Delia had asked a client for help in escaping from the MR-TO.  Jose Miguel PSR ¶ 64.  Francisco MP hit Delia in the

face and jaw with a closed fist.  Trial Tr. 811 (Delia's testimony).  The next day, Delia was unable to open her mouth.  Id.  Rosalio MR told her that if she tried to escape again, he would hire a hit man and have her entire family killed, including children and grandparents. Id.  After this, Francisco MP hit Delia on other occasions.  Trial Tr. 812.  Whenever Francisco MP believed Delia was pregnant, he would wait until she was seated and would grab her ankles and violently pull her to the floor from where she was seated, in an attempt to cause an abortion.  Id.  This caused Delia to suffer severe back pain.  Id.

On one occasion, a client would not allow her to leave and held a knife to her body and threatened to kill her. Jose Miguel PSR ¶ 66; Tr. 855.  After this incident, Delia called Francisco MP.  He did not care and told her she had to keep working to send money to his family because his grandmother had died.  Tr. 856.

After this incident, in April 2014, Delia ran away from the Queens residence and later reported what had happened to her to the police.  Jose Miguel PSR ¶ 66.  When she escaped, Delia was 17 years old, having already worked in prostitution from the fall of 2010 through mid-April 2014.  Id.

      vi.   Daisy (Jane Doe #6)

Daisy met Fabian Reyes-Rojas (herein referred to as "Fabian RR") in approximately January 2011 in Tenancingo, Mexico.  Jose Miguel PSR ¶ 67.  At the time, Daisy was about 19 years old and lived in Tenancingo with her mother, where she studied engineering in college.  Id.  On the day Daisy first met Fabian RR, Fabian RR knocked on her door and invited her to attend a carnival in town.  Daisy declined, but Fabian RR waited for her the following week after school and they began talking.  Id.  Fabian RR continued to pursue her until Daisy agreed to date him.  Id.  After their relationship progressed, Daisy

22

believed that Fabian RR was her boyfriend and that he wanted to marry her.  Fabian RR asked Daisy to travel to the United States with him, and told her that she could work as a waitress in the United States for a year and make enough money to return to Mexico and finish school, and afterward they would still have enough money to build a house together. Id.; Tr. 198.  Fabian RR convinced Daisy's mother of this as well, and her mother allowed Daisy to go with him to live at his sister's house in Tenancingo.  While at Fabian RR's sister's house, Daisy was not permitted to leave the house or to call her mother.  Jose Miguel PSR ¶ 67.

In approximately August 2011, Fabian RR made the arrangements to transport Daisy to the United States.  Jose Miguel PSR ¶ 68.  Fabian RR's cousin, Rosalio MR, sent him money to cover the travel expenses.  Id.  Fabian RR and Daisy then traveled from Tenancingo to the U.S.-Mexico border.  However, their attempt to cross the border was difficult and ultimately unsuccessful.  Daisy and Fabian RR were encountered at the border, taken to a detention center, and returned to Mexico.  They then traveled together back to Tenancingo.  Id.

After returning to Tenancingo, Fabian RR told Daisy that they would go visit his godmother in Chiapas.  Jose Miguel PSR ¶ 69.  A few days after their arrival in Chiapas, Fabian RR told Daisy that she had to work in prostitution.  Id.  When Daisy told Fabian RR she did not want to work as a prostitute, Fabian RR slapped her and threw her on the bed.  Id. He then left her alone for two days with no food.  Upon his return, Fabian RR told Daisy that if she earned enough in a week, they could return home.  Daisy was scared, did not know anyone in Chiapas, and feared Fabian RR might really hurt her.  Id.  Under those

circumstances, Daisy relented and agreed to work as a prostitute in Fabian RR's godmother's brothel.  Id.

At the end of the week, Daisy asked to return home.  Jose Miguel PSR ¶ 70. Fabian RR asked her how she thought she could return home after working in prostitution, as all of her family and friends would think she was a whore.  Id.  Embarrassed, scared, and believing she had no other choice, Daisy stayed with Fabian RR.  She continued to work as a prostitute in Mexico, working seven days a week, for several months.  Id.  She gave all of the money she earned to Fabian RR or to his godmother, but Fabian RR did not bring her back to Tenancingo.  Id.

In approximately May 2012, Fabian RR and Daisy tried to cross the border again, but were caught.  Jose Miguel PSR ¶ 71. Daisy was pregnant at the time and was released.  Fabian RR was detained for a month.  Id.

After being returned to Mexico, Daisy moved to Fabian RR's mother's home. After she arrived, Fabian RR's mother arranged for Daisy to have an abortion.  Id.  Daisy, believing she was going for a medical check-up, went to the doctor.  Id.  Once there, she found out that the appointment was actually for an abortion.  Id.  Feeling that she had no other alternative, Daisy agreed to go through with the procedure.  Id.

In July 2012, Fabian RR took Daisy to Mexico City, where he forced her to work in prostitution so that she could pay Fabian RR's family members back for fees spent on the abortion:

Q:          Where did you go?

DAISY:     To Mexico City.

Q:          And why did you go there?

| | | |
|---|---|---|
| DAISY: | | Because he said I had to go back to work in prostitution so that I could pay his sister for the money that she had spent on the abortion. |
| Q: | | Did you feel that you had to go to Mexico City? |
| DAISY: | | Yes. |
| Q: | | Why? |
| DAISY: | | Because I didn't want him to beat me again. |

Tr. 221.

Daisy continued to be afraid Fabian RR would beat her.  For the next several months, Daisy worked as a prostitute in Mexico City.  Jose Miguel PSR ¶ 72.

In approximately the summer of 2013, Fabian RR obtained money from Rosalio RR and his sisters, who were in the United States, and planned another attempt to cross the border with Daisy.  Jose Miguel PSR ¶ 73.  On this attempt, Fabian RR and Daisy successfully made into the United States through Tucson, Arizona, without getting caught. From there, they were transported to Queens, New York.  Id.

After they arrived in Queens, Fabian RR and Daisy lived in an apartment rented by Fabian RR's cousin, Rosalio MR.   Jose Miguel PSR ¶ 74.   Also living in the apartment were Francisco MP, Fabiola, who was working as a prostitute for Rosalio MR (Francisco MP's uncle), and Delia, who was working as a prostitute for Francisco MP.  Id. After a few days at the apartment, Fabian RR told Daisy that he could not find work and that she needed to work as a prostitute again so that they could pay back their smuggling fees.  Id. Daisy was very scared, and found herself in a country where she did not know anybody or speak the language.  Because she felt that she had no other option, she started working in

prostitution.  Id.  Rosalio MR gave her a cell phone and Fabiola gave Daisy condoms and delivery drivers' phone numbers.  Id.

While Daisy worked in prostitution, deliver drivers picked her up and took her to different locations, including locations in Queens, Brooklyn, Manhattan, the Bronx, and also Connecticut, Virginia, and Pennsylvania.  Jose Miguel PSR ¶ 75.   Daisy was forced to work seven days a week, even if she was menstruating.  Id.  She saw approximately 20 to 30 men per night and worked morning shifts from 9 a.m. to 5 pm and evening shifts from 7 p.m. to 3 a.m.  She gave half of the money she earned to the delivery drivers, and other half to Fabian RR.   Sometimes, Fabian RR told her that she was not making enough money and that she needed to work double shifts.  Fabian RR would beat her if she ever said she did not want to continue to work in prostitution.

Q:        Can you tell the jury how he beat you?

DAISY:    Well, he always – when he started getting mad he would slap me in the face when we started arguing, and after he would do that all the time; and so after that I would get very scared and I would just shut up.

Q:        How did it feel when he beat you?

DAISY:    First of all, I was very scared.  Then I felt bad about it.

Q:        When you say you "felt bad about it," what do you mean?

DAISY:    I felt that I didn't matter to anybody.  I felt like an object.  I felt like garbage.

Tr. 239.

When she told him that she did not want to work anymore, Fabian RR told her that the police would not believe her.   Jose Miguel PSR ¶ 75; Tr. 245.

Eventually, Daisy and Fabian RR moved to another apartment in Queens, New York, where two other couples resided.   Jose Miguel PSR ¶ 76.  Fabian RR continually pressured Daisy to make more money in prostitution by working more days and more hours. He kept her isolated, continued to take all of the money she earned, and would not allow her to speak to her family unless he was present.  Id.

In 2014, Daisy became friends with a driver who delivered her to prostitution clients, who offered to help her escape.  Jose Miguel PSR ¶ 77.  One day, he sent her a text message on her cell phone, and when Fabian RR saw the message from the driver, he cursed Daisy and beat her severely.  Id.  In approximately January 2015, Daisy was able to escape with help from the driver.  Id.

II.    The Defendants' Convictions

On December 27, 2019, defendant Fabian RR pleaded guilty to Counts 3 and 13 of the Second Superseding Indictment.

On March 13, 2020, defendants Jose Miguel MR, Jose Osvaldo MR, Rosalio MR, Francisco MP, and Abel RM were convicted after a jury trial of all counts in the Second Superseding Indictment.

APPLICABLE LAW

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted); see also United States v. Booker, 125 S. Ct. 738, 743 (2005) (although the Guidelines are advisory,

district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence).

Next, courts should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the Court] may not presume that the Guidelines range is reasonable.  [It] must make an individualized assessment based on the facts presented."  Gall, 552 U.S. at 50 (citation and footnote omitted).  Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of [18 U.S.C. § 3553(a)(2)]."  The factors courts shall consider in imposing sentence include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as well as the need for the sentence imposed:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In addition, 18 U.S.C. § 3661 provides that, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

THE GUIDELINES

The United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") calculations detailed in each of the defendants' PSRs are accurate. The government addresses each defendant's objections, if any, to the Guidelines calculations in the respective defendants' section below.

ARGUMENT

As detailed in the PSR and set forth above, the defendants subjected the young women and girls in this case to unimaginable pain and misery. They treated their victims like objects, forcing them to have sex with countless men and subjecting them to brutal violence, sexual assaults, forced abortions, and mental and emotional harm. The defendants' acts were part of a pattern of abusive conduct designed to earn maximum profit at their victims' expense. Each of the defendants was personally responsible for victimizing at least one young woman or girl and actively participated in the exploitation of many others.

With the exception of Fabian RR, the defendants' sentencing submissions do not indicate that the defendants accept responsibility or feel remorse for their actions. The sentencing submissions filed on behalf of Jose Miguel MR and Rosalio MR make no mention of their many victims whatsoever. The sentencing submission filed on behalf of Abel RM outright labels Diana a "liar" and states that she gave "false testimony" when she detailed the extreme abuse she suffered at the hands of the defendants when she was a minor, testimony which, of course, the jury credited. See Abel RM Mem. at 6-9. The sentencing submission filed on behalf of Jose Osvaldo MR falsely "denies that he ever participated in specific instances of rape, assaults, kidnapping, and forced abortions of his victims." Jose Osvaldo MR Mem. at 3. The sentencing submission filed on behalf of Francisco MP

describes the "relationship" between Francisco MP and Delia to be "warped" but "legitimate and reciprocal," Francisco MP Mem. at 3.  The government respectfully submits that the need for specific and general deterrence is of particular concern to the government in this case.

      The defendants' unwillingness to accept responsibility for their conduct—or even to express basic recognition of the humanity of their many victims or the depth of their suffering—warrants significant consideration by this Court at sentencing.  See, e.g., United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (stating that defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); United States v. Wallace, 755 F. App'x 63, 65 (2d Cir. 2018) (summary order) ("A defendant's lack of remorse is an appropriate sentencing factor.").  Cf. United States v. Sanchez, 433 F. App'x 44, 45-46 (2d Cir. 2011) (summary order) (affirming district court's imposition of an above-Guidelines sentence in a sex trafficking case notwithstanding the defendant's expressions of remorse where the district court concluded that the "horror show described in the facts" merited the sentence it imposed).

      The sentences imposed on the defendants should reflect the incalculable damage they have done to their victims.  The government respectfully submits that a Guidelines sentence of life imprisonment for Jose Osvaldo MR, Jose Miguel MR and Rosalio MR and a sentence of 420 months' imprisonment for Francisco MP and Abel RM are necessary to provide appropriate punishment, to protect the public from further crimes, to promote respect for the law, and to discourage others from committing similar crimes.  As to

Fabian RR, the government further respectfully submits that, pursuant to the terms of the plea agreement and the Guidelines calculation therein, a sentence within the effective Guidelines range of 180 months is sufficient but not greater than necessary to achieve the goals of sentencing.

     I.    <u>Jose Miguel Melendez-Rojas</u>

     i.    <u>Applicable Guidelines</u>

The Guidelines calculation as to Jose Miguel MR is accurate and, based on a total offense level of 43 and a criminal history category of I, results in an advisory Guidelines range of life in prison.

| Group | Count | Adjusted Offense Level | Units |
|-------|-------|------------------------|-------|
| 1 | Counts 1 and 12 | 25 | 0.0 |
| 2 | Counts 2, 3, 4, 15 and 16 (Diana) | 40 | 1.0 |
| 3 | Counts 3, 5, 16 (Veronica) | 36 | 1.0 |
| 4 | Counts 2, 3, 10, 11 and 16 (Delia) | 40 | 1.0 |

The offense level applicable to the Group with the highest offense level is 40.  Because 3 units results in an increase of three levels pursuant to Guidelines Section 3D1.4, the combined adjusted offense level is 43.

     ii.    <u>Analysis</u>

The government respectfully submits that the Court should sentence the defendant Jose Miguel RR to a Guidelines sentence of life imprisonment.  For years, the defendant brutally exploited young women and minors for his own profit.  As discussed

above, Diana was only 16 years old when she met Jose Miguel RR.  He smuggled her into

the United States and forced her into prostitution.  Jose Miguel RR controlled Diana through

violence, manipulation and fear.  As Diana testified, when she "didn't behave properly," Jose

Miguel RR "punished her" by abusing her physically, including by cutting her legs with

broken glass and refusing to allow her to go to the hospital for her injuries.  Trial Tr. 1274.

Jose Miguel RR also beat and raped Diana in front of the entire household when she tried to

escape.  Trial Tr. 1278.  Even so, Diana eventually successfully escaped, and after she did,

Jose Miguel RR then recruited Veronica, forcing her to work as a prostitute and telling her

that if she didn't comply, he would "chop" her mother up into "little pieces."  Trial Tr. 1389.

Jose Miguel RR beat Veronica and insulted her.  Trial Tr. 1398.  Veronica only summoned

the courage to escape after Osvaldo MR took Veronica's little sister from her family's home

in order to force her into prostitution.  Trial Tr. 1406, 1430.  The government respectfully

submits that a Guidelines sentence of life imprisonment is necessary to provide appropriate

punishment, to protect the public from further crimes by Jose Miguel RR, to promote respect

for the law, and to discourage others from committing similar crimes.

        Jose Miguel MR also argues that the Court should downwardly depart from a

Guidelines sentence because he has been detained at the Metropolitan Detention Center

("MDC") during power outages and the COVID-19 pandemic.  Jose Miguel RR Mem. at 6-

12.  Though "pre-sentence confinement conditions may in appropriate cases be a permissible

basis for downward departures," United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001),

courts typically grant such departures only where "the conditions in question [were] extreme

to an exceptional degree and their severity [fell] upon the defendant in some highly unusual

or disproportionate manner." United States v. Mateo, 299 F. Supp. 2d 201, 208 (S.D.N.Y.

2004).  Jose Miguel MR cannot show that the conditions at the MDC impacted him in an exceptional or more severe manner than any other MDC inmate.  The conditions of confinement at MDC are not a basis for a downward departure.  See United States v. Robinson, 799 F.3d 196, 199 (2d Cir 2015) (finding no error in district court's denial of a downward departure despite defendant's allegations of pre-trial confinement facility having, among other things, unsanitary food preparation, no heating system, leaks, insect infestations and violent gang members housed with non-gang affiliated inmates).

The defendant also attempts to use his childhood and upbringing in Tenancingo to explain his conduct.  The submission notes that Jose Miguel RR was "forced to leave school so that he could work in the fields," which gave rise to the area's "main occupation – family-run prostitution businesses."  Jose Miguel RR Mem. at 13.  Even if true, this does not explain or excuse his crimes.  Jose Miguel RR spent years in the United States, during which he beat, raped, and forced young women and girls into prostitution.  He knew well that his actions were criminal, because he threatened his victims not to report his crimes to the police.  See, e.g., Trial Tr. at 1275 (Diana's testimony that Jose Miguel RR told her that the police would not believe her); 1390 (Veronica's testimony that she was told that "if I said anything to the police that they were going to send somebody to kill my family.").

Jose Miguel RR treated his victims with unimaginable cruelty, with no regard for their dignity or humanity.  At trial, Veronica recounted one conversation in which Jose Miguel RR and his family members discussed "getting the girls ready because they weren't producing enough money."  Trial Tr. 1403.  As Veronica explained, the men were referring to preparing them for "anal sex, they wanted to have them make more money, to bring in more money because they were preparing us as if we were animals[.]"  Trial Tr. 1404.  The

33

defendant's history and characteristics do not and cannot explain or justify his treatment of his women as sub-human.

The Court should reject Jose Miguel RR's request for leniency and sentence him to a sentence of life imprisonment.

II.   Jose Osvaldo Melendez-Rojas

i.   Applicable Guidelines

The Guidelines calculation as to Jose Osvaldo MR is accurate and, based on a total offense level of 43 and a criminal history category of I, results in an advisory Guidelines range of life in prison.

| Group | Count | Adjusted Offense Level | Units |
|---|---|---|---|
| 1 | Counts 1, 7, 9 and 12 | 25 | 0.0 |
| 2 | Counts 3, 5 and 16 (Veronica) | 36 | 1.0 |
| 3 | Counts 3, 6 and 16 (Fabiola) | 38 | 1.0 |
| 4 | Counts 3, 8 and 16 (Maria Rosalba) | 38 | 1.0 |
| 5 | Counts 2, 3, 10, 11, 15 and 16 (Delia) | 40 | 1.0 |

The offense level applicable to the Group with the highest offense level is 40. Because 4 units results in an increase of four levels pursuant to Guidelines Section 3D1.4, the combined adjusted offense level is 44. Where a total offense level is calculated in excess of 43, pursuant to Chapter 5, Part A (comment n.2), the offense level is treated as a level 43.

ii.   <u>Analysis</u>

The government respectfully submits that the Court should sentence the defendant Jose Osvaldo MR to a Guidelines sentence of life imprisonment.

a.   <u>The 3553(a) Factors Warrant a Life Sentence</u>

The violence and abuse that Jose Osvaldo MR and his co-defendants meted out to his victims, particularly Maria Rosalba, cannot be overstated. Jose Osvaldo MR lured Maria Rosalba to first move with him to his hometown of Tenancingo, where he raped her and beat her on multiple occasions. He also forced her to have an abortion. He insulted her relentlessly, calling her fat, ugly, telling her she was worthless and that no one cared what happened to her. Jose Osvaldo MR then convinced Maria Rosalba to travel to the United States, promising her that eventually they would get married, and while in the United States, they would work in a market. Immediately they crossed the border into the United States, Jose Osvaldo told her he was going to do something to her she was "never, ever going to be able to forget," and then he raped her in the desert. Tr. 455. As soon as they arrived in New York, Jose Osvaldo MR told Maria Rosalba, "Welcome to your reality." Tr. 458. This is how Jose Osvaldo MR chose to tell her that she would be working in prostitution instead of the market he had promised. When she refused, he threatened her; he told her that the police would throw her in jail if she said anything and that her family in Mexico didn't care what happened to her. Once she agreed to work as a prostitute, he forced her to work almost every day and took all of the money she earned. When Jose Osvaldo MR returned to Mexico, he had his sister's husband continue to collect Maria Rosalba's prostitution earnings from her.

Jose Osvaldo MR did everything he could to rob Maria Rosalba of her dignity and self-worth. His systematic callousness and violence toward her must be justly punished

and he should be prevented from ever treating another human being this way.  The

appropriate sentence for the crimes Jose Osvaldo MR committed is life imprisonment.

      b.   The Court Should Reject Jose Osvaldo MR's Request for a
Downward Departure from the Guidelines

In his sentencing memorandum, Jose Osvaldo MR raises belated objections to

the PSR.  See Jose Osvaldo MR Sentencing Memo, ECF No. 274; Fed. R. Crim. P. 32(f)

(parties must raise objections to the PSR within 14 days of disclosure).  Jose Osvaldo MR

objects to the factual accuracy of paragraphs 20-21, 31 and 35-40 of the PSR, because "he

denies that he ever participated in specific instances of rape, assaults, kidnapping, and forced

abortions of the victims."  Jose Osvaldo MR Mem. at 3.  The trial record overwhelmingly

established Jose Osvaldo MR's participation in these crimes.  The government respectfully

submits that it has already proved these facts by a preponderance of the evidence, see, e.g.,

United States v. Lee, 818 F.2d 1052, 1057 (2d Cir. 1987) (standard of proof for disputed

presentence report allegations is preponderance of the evidence), and that a Fatico hearing is

therefore unnecessary.  These objections also demonstrate a complete lack of remorse and

further illustrate why life imprisonment is the only just sentence for this defendant.

Jose Osvaldo presses four arguments in support of his request for a downward

departure: (1) his purportedly "limited role" in the conspiracy; (2) the fact that he grew up in

poverty in Mexico; and (3) the "horrific living conditions" that he experienced while in pre-

sentence confinement at the MDC during power outages and the pandemic.  See Jose

Osvaldo MR Mem. at 5, 6, 8.

First, Jose Osvaldo MR's characterizations of his own conduct could not be

further from the truth.  Jose Osvaldo MR was instrumental in smuggling several women into

the United States and forcing them into prostitution.  The jury convicted him of being directly involved in the trafficking of Veronica, Maria Rosalba, Delia and Fabiola.  The facts set forth in the PSR were all part of the victims' testimony at trial.  Jose Osvaldo MR's feeble and futile attempt to avoid a lengthy sentence for the crimes he committed is evidence that he has not taken responsibility for his actions and continues to disrespect the victims who courageously testified against him.

Second, Jose Osvaldo MR attempts to justify forcing victims to prostitute themselves against their will by arguing that he and his family were poverty-stricken and he hoped "to provide his family with a better life."  Jose Osvaldo MR Mem. at 4.  On the contrary, he and his co-defendants sent his family members in Mexico thousands of dollars as a result of their violent tactics to keep the victims working in prostitution for years, while he and his brothers and nephew worked out and played all day.  Trial Tr. 487.  In addition, evidence at trial proved that Jose Osvaldo and his family had considerable power in Tenancingo.  PSR ¶33; Trial Tr. 420.  Such power does not indicate that Jose Osvaldo's family was incredibly impoverished; it indicates the opposite.  In addition, Maria Rosalba testified that she had been inside the family's compound, which consisted of various family members' houses with a common courtyard.  She did not testify that the family was living in poverty or squalor.  Instead, they had vehicles (Trial Tr. 411), funds to smuggle their victims and themselves across the border (Trial Tr. 202; 216; 641; 733) and the clout to have the mayor of the town create fraudulent official documents for them (Trial Tr. 420).  In addition, even if this life of poverty that Jose Osvaldo MR describes was accurate, it does not excuse his actions.  Poverty is not a justification for forcing women into prostitution and violently abusing them for financial gain.

Third, Jose Osvaldo MR argues that the Court should downwardly depart from a Guidelines sentence because of the conditions of his confinement at MDC.  The Court should reject this argument for the same reasons set forth above.  It is telling that Jose Osvaldo MR adamantly denies subjecting the victims to the abhorrent treatment they detailed in their painful testimony, yet now argues his conditions of confinement warrant a dramatic downward departure from the Guidelines.  The Court should take heed of this failure to express any remorse for his actions, deny Jose Osvaldo MR's request for a downward departure and sentence him to life in prison.

III.     Rosalio Melendez-Rojas

i.     Applicable Guidelines

The Guidelines calculation as to Rosalio MR is accurate and, based on a total offense level of 43 and a criminal history category of I, results in an advisory Guidelines range of life in prison.

| Group | Count | Adjusted Offense Level | Units |
|-------|-------|------------------------|-------|
| 1 | Counts 1, 7, 12 and 14 | 25 | 0.0 |
| 2 | Counts 2, 3, 4, 15 and 16 (Diana) | 40 | 1.0 |
| 3 | Counts 3, 5 and 16 (Veronica) | 36 | 1.0 |
| 4 | Counts 3, 6 and 16 (Fabiola) | 38 | 1.0 |
| 5 | Counts 2, 3, 10, 11 and 16 (Delia) | 40 | 1.0 |
| 6 | Counts 3 and 16 (Elizabeth – Jane Doe #7) | 36 | 1.0 |

| 7 | Counts 3 and 16 (Fabiola – Jane Doe #9) | 36 | 1.0 |

The offense level applicable to the Group with the highest offense level is 40. Because five units results in an increase of five levels pursuant to Guidelines Section 3D1.4, the combined adjusted offense level is 45. Where a total offense level is calculated in excess of 43, pursuant to Chapter 5, Part A (comment n.2), the offense level is treated as a level 43.

ii.   Analysis

The government respectfully submits that the Court should sentence the defendant Rosalio MR to a Guidelines sentence of life imprisonment. Rosalio MR's extreme violence and cruelty to his victims warrant severe punishment. As detailed in the PSR above, Rosalio MR used violence and manipulation to force his many victims to work as prostitutes for him. At trial, Diana recalled witnessing Rosalio MR beating "Karina" brutally "in the body" so that it "wouldn't leave a scar." Trial Tr. 1275. She overheard Rosalio telling Karina that he was "going to put her inside a plastic bag, cut up in pieces." Id.

His conduct towards Fabiola was particularly cruel. Fabiola testified that after Rosalio MR threatened her and forced her to work as a prostitute, she "felt destroyed." Trial Tr. 643. When Fabiola told Rosalio MR that a client raped her and held a gun to her head, Rosalio MR reacted "as if nothing had happened." Trial Tr. 662. She recounted that he said "nothing happened to you, you're all right." Id. Rosalio MR also tricked Fabiola into taking pills that would make her miscarry. When Fabiola told Rosalio MR that she did not want to get an abortion, Rosalio MR put the pills into packaging that contained a label indicating that they were folic acid. Trial Tr. 654. He told Fabiola that the pills contained folic acid, and

Fabiola took them and miscarried.  Years later, Rosalio MR confirmed that he had deliberately given Fabiola pills to force her to miscarry.

To protect the public from the defendant, and to justly punish his years of abuse and exploitation, the Court should impose a Guidelines sentence of life imprisonment.

IV.    Francisco Melendez-Perez

i.    Applicable Guidelines

The Guidelines calculation as to Francisco MP is accurate and, based on a total offense level of 42 and a criminal history category of I, results in an advisory Guidelines range of 360 months to life in prison.

| Group | Count | Adjusted Offense Level | Units |
|---|---|---|---|
| 1 | Counts 1, 9 and 12 | 25 | 0.0 |
| 2 | Counts 3a, 8 and 16 (Maria Rosalba) | 38 | 1.0 |
| 3 | Counts 2, 3b, 10, 11, 15 and 16 (Delia) | 40 | 1.0 |

The offense level applicable to the Group with the highest offense level is 40.  Because 2 units results in an increase of two levels pursuant to Guidelines Section 3D1.4, the combined adjusted offense level for Francisco MP is 42.

ii.    Analysis

The government respectfully submits that the Court should sentence the defendant Francisco MP to a Guidelines sentence of 420 months.  As discussed above, Delia was 14 years old when Francisco smuggled her into the United States and forced her into prostitution.  Francisco MP was directly responsible for forcing Delia, barely a teenager, to

become a prostitute and used violence and threats to ensure that she continued to work.  He counted out her condoms for her shifts, counted the remaining condoms when she returned from a shift and took all of the money she earned from prostitution.  When Francisco MP learned that Delia spoke to a client about trying to escape, he punched her in the face so hard that she was unable to open her mouth the next day.  Each time he suspected Delia might be pregnant, he violently pulled her to the floor by her ankles in an effort to cause an abortion.  Tr. 812.  Even when Francisco MP returned to Mexico in 2011, he visited her family and told her he would bring her younger sister to the United States to become a prostitute if she did not work more shifts and send more money to him and his family.  Tr. 806.

In his sentencing memorandum, Francisco MP claims he was a child when he smuggled Delia into the United States and was simply doing what his family told him to do.  See Francisco MP's Mem.  That assertion is belied by the fact that Francisco MP turned 18 in June 2012 and continued to force Delia to be a prostitute for almost two more years.  In fact, it was as an adult that Francisco MP punched Delia in the face in the summer of 2013, and he was an adult each time he beat her thereafter.  He was almost 20 years old when a client held Delia at knifepoint and threatened to kill her.  When Delia told Francisco MP about this terrifying incident, he told her she had to keep working as a prostitute and keep sending money to his family in Mexico.  Francisco MP cannot pretend to have been an innocent child, simply following orders from his family members.  He displayed a level of cruelty and callousness toward Delia that underscores his culpability in the crimes he committed.

Francisco MP also assisted Jose Osvaldo MR in smuggling Maria Rosalba into the United States and forcing her into prostitution.  As Francisco MP pointed out in his

sentencing memorandum, see Francisco MP's Mem. at 5, he knew that the family business was to force each woman they smuggled into the United States into prostitution for the family's financial gain.  Francisco MP also knew that Jose Osvaldo would use violence and threats to force Maria Rosalba to work as a prostitute, as every man in his family engaged in sex trafficking.   Francisco must be held accountable for the decisions he made, in actively participating in the family business when he helped smuggle Delia and Maria Rosalba into the United States, and in furthering its sinister legacy by continuing to force Delia to be a prostitute for several years, and, indeed, well after he turned 18.   Due to the seriousness of the offense, the need for just punishment and specific deterrence in particular, the Court should sentence Francisco MP to 420 months' imprisonment.

V.     Abel Romero-Melendez

i.     Applicable Guidelines

The Guidelines calculation as to Abel RM is accurate and, based on a total offense level of 42 and a criminal history category of I, results in an advisory Guidelines range of 360 months to life in prison:

| Group | Count | Adjusted Offense Level | Units |
|-------|-------|------------------------|-------|
| 1 | Counts 1 and 18 | 25 | 0.0 |
| 2 | Counts 2, 3a, 5 and 4 (Diana) | 40 | 1.0 |
| 3 | Counts 3b (Cristina/Estephanie – Jane Doe #8) | 36 | 1.0 |

The offense level applicable to the Group with the highest offense level is 40.  Because two units results in an increase of two levels pursuant to Guidelines Section 3D1.4, the combined adjusted offense level is 42.

Abel RM objects to this Guideline calculation and claims that the "evidence shows that Mr. Romero-Melendez did not mistreat or control anyone" and that Diana's testimony was "false."  Abel RM Mem. at 12-13.  The Court should reject these arguments, but take them into consideration as aggravating circumstances in assessing Abel RM's lack of contrition and risk of re-offending.

The trial record overwhelmingly established that Abel RM participated in the sex trafficking of Diana and Cristina/Estephanie.  As detailed at trial and corroborated by other evidence, including border crossing records, in approximately July 2006, Abel RM and Jose Miguel MR smuggled Diana, a minor, across the border into the United States and instructed her to use a false date of birth.  Trial Tr. 1240.  A few months later, Abel RM, accompanied by Cristina, arrived at the apartment in Queens where Diana was living with Rosalio MR and Karina.[5]  Diana testified that Cristina was young and quiet, with "long hair." Trial Tr. 1264.  After Cristina moved into the apartment, Diana observed that Cristina was forced to engage in prostitution, just as Diana had been:

---

[5]     Statements made by Cristina to law enforcement in July and August 2017 regarding her arrival in the United States are largely consistent with Diana's testimony.  See 3500-Cristina-1, 3500-Cristina-2.  In her meetings with law enforcement, Cristina made the following statements, among others:  Abel RM asked her to be his girlfriend and invited her to come to the United States to work.  Cristina crossed the border into the United States in approximately May 2005 and Abel RM paid the smuggling fee for her to cross.  When she arrived in the United States, she was a virgin.  Elizabeth (Jane Doe #7, referred to as "Karina" by Diana) taught Cristina how to work as a prostitute, although at first Cristina did not want to work as a prostitute.  Abel RM took all of the money Cristina earned from prostitution.  Id.

> I came out of the bathroom and [Cristina] was crying, and I heard Karina say that she didn't want to go. I heard Karina's phone ring and she picked up. I just saw the two of them go out together. . . . I knew there was somebody outside waiting for them who was going to take them to the same place. She had makeup on.

Trial Tr. at 1264-66. Later that day, Diana saw Abel breaking up packets of condoms for Cristina. Id. Diana testified that Cristina gave all her money from prostitution to Abel RM. Daisy also testified that Cristina worked for a prostitute for Abel RM. See Trial Tr. 265. Diana and Daisy's testimony is corroborated by, among other things, border crossing records, evidence obtained from the execution of a search warrant at the residence in which Abel RM lived with Cristina, and Delia's testimony, and proves Abel RM's participation in the sex trafficking conspiracy as to both Diana and Cristina beyond a preponderance of the evidence.

The Court should also reject Abel RM's various objections to the applicability of the Guidelines enhancements. Count 2 of the Second Superseding Indictment (conspiracy to transport minors for purposes of prostitution) is governed by Guideline § 2G1.3, which provides for a base offense level of 34 since Diana was a minor. The Probation Department did not err in applying two two-level enhancements under § 2G1.3(b)(2) and § 2G1.3(b)(4) because the trial record clearly established that Diana was coerced to engage in prohibited sexual conduct and the offense involved the commission of a sex act or sexual contact. Indeed, all of the cases cited by Abel RM support the applicability of these enhancements. See Abel RM Mem. at 19-21. Nor did the Probation Department err in applying a vulnerable victim enhancement pursuant to § 3A1.1(b), since Abel RM knew or should have known that

Diana was "unusually vulnerable due to her age, physical [and] mental condition."  U.S.S.G.

§ 3A1.1, Application Note 2.

Abel RM provides no explanation for his objections to the Guidelines

enhancements to Count One, Abel RM Mem. at 17-18, and, in any event, the applicability of

these enhancements have no impact on the overall Guidelines calculation.

ii.   Analysis

The government respectfully submits that the Court should sentence the

defendant Abel RM to a sentence of 420 months' imprisonment.  Abel RM, along with his

family members, used manipulation and abuse to force women to work in prostitution for his

and his family's benefit.  He helped Jose Miguel RM bring Diana, a sixteen-year-old girl,

across the border into the United States, and profited from her extreme exploitation.  Abel

RM showed no empathy or concern for his victims.  As Diana recounted, Abel RM sat with

Jose Miguel MR and Rosalio MR, drinking and laughing about how much money their

victims were making for them.  Trial Tr. 1267-68.  Diana recalled Abel RM bragging that

"he had the youngest one," referring to Cristina, and that Rosalio RM noted that Karina was

"getting old and fat, and that it was time to exchange her."  Id.  Abel RM was present when

Jose Miguel MR burned Diana and cut her leg as punishment for attempting to escape.  Trial

Tr. 1274-75.  Abel RM also watched Jose Miguel MR rape Diana after Diana tried to escape.

Trial Tr. 1278.

The Court should reject Abel RM's request for a substantially below-

Guidelines sentence.  A downward departure is not warranted due to Abel RM's "national

origin or socioeconomic status," Abel RM Mem. at 28-31.  See 28 U.S.C. § 994(d) ("The

Commission shall assure that the guidelines and policy statements are entirely neutral as

to . . . national origin [and] socioeconomic status of offenders."); U.S.S.G. § 5H1.10 (socioeconomic status not relevant); see also U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant).

Moreover, the fact that Abel RM lived in poverty in Tenancingo does not explain or excuse his actions in forcing women to work as prostitutes in the United States. As the defendant's memorandum notes, between 2015 and 2017, Abel RM was employed at an automotive store in North Carolina.  Abel RM Mem. at 32.  Even though Abel RM was clearly able to secure employment, he chose to profit from women's bodies.  As Daisy testified, "Lizbeth" was another prostitute who worked for Abel RM and "made a lot of money" in North Carolina.  Trial Tr. 289-90.  Daisy testified that she heard Abel RM state that he had "bought himself two cars" with the money Lizbeth had earned.  Id.  The Court should therefore reject any argument that Abel RM should receive a lesser sentence because of his financial circumstances.

VI.    Fabian Reyes-Rojas

i.    Applicable Guidelines

The Guidelines calculation as to Fabian Reyes-Rojas is accurate and, based on a total offense level of 33 and a criminal history category of I, results in an advisory Guidelines range of 135-168 months in prison.  However, the mandatory minimum sentence on Count 13 is 15 years and therefore the effective Guidelines range is 180 months, or 15 years.

| Counts/Adjustments | Offense Level |
|---|---|

| Counts 3 and 13 | 36 |
| Acceptance of Responsibility | -3 |
| Total | 33 |

The adjusted offense level is 30.   Because the defendant pleaded guilty, and accepted responsibility for his offenses, the offense level is decreased by three levels pursuant to Guidelines Section 3E1.1(a) and (b), resulting in a total offense level of 33.

     ii.   <u>Analysis</u>

     The government respectfully submits that the Court should sentence the defendant Fabian RR to a term of imprisonment of 15 years.  Fabian RR was directly and solely responsible for smuggling Daisy into the United States and forcing her to work in prostitution.  Tr. 233.  Even before arriving in the United States, Fabian forced Daisy to work in prostitution in Mexico and was violent with her.  He and his family forced her to have an abortion and then, with abject cruelty, forced her to work as a prostitute to pay his family back for the cost of the abortion that she did not want.  Fabian RR was often violent with Daisy and verbally abused her.  Tr. 204; 222.  If she ever refused to work, Fabian RR would become violent and would slap her.  Tr. 239.  When Daisy was working in White Plains, a client tried to choke her.  When she told Fabian about it, he told her to keep working.  Tr. 242; 244.  When Daisy would tell Fabian RR that she wanted to get help and leave, and stop working in prostitution, Fabian RR would laugh in her face and would tell her that no one would believe her.  When she tried to escape, he beat her.

In his sentencing memo, Fabian RR belatedly argues that the vulnerable victim enhancement – Section 3A1.1 of the Guidelines – does not apply to Daisy.[6]  Guideline § 3A1.1(b) provides for a two-level adjustment "[i]f the defendant knew or should known that a victim of the offense was a vulnerable victim."  A vulnerable victim is a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, Application Note 2.  Here, the Probation Department is correct in its determination that the victims in this case, including Daisy, were vulnerable because they were "young, poor, and uneducated [victims] from impoverished areas of Mexico," see, e.g., Jose Miguel MR PSR ¶101; see also United States v. Valenzuela, 495 Fed. App'x 817, 821 (9th Cir. 2012) (applying adjustment "where [v]ictims were predominantly poor, uneducated, far from home and without connections in the United States, unable to speak English, and unwilling to go to the police for fear of deportation"); United States v. Jimenez-Calderon, 183 Fed. App'x 274, 279-80 (3d Cir. 2006) ("These girls were young, uneducated, naive and from extremely impoverished families.").

The commentary to Section 3A1.1 further provides that the vulnerable victim enhancement should be applied when "the defendant knows or should have known of the victim's unusual vulnerability." U.S.S.G. § 3A1.1, Application Note 2.  Despite the fact that Daisy was enrolled in college, she came from an impoverished single-parent household in Tenancingo, where prostitution and the exploitation of women was commonplace.  Fabian RR used guilt to manipulate Daisy into leaving school and going with him to find work so

---

[6]        Fabian RR did not file objections to the PSR; see Fed. R. Crim. P. 32(f).

that she could help her mother financially.  Here, Fabian RR's interactions with Daisy made

him fully aware of her vulnerabilities and he exploited them at every turn.   A sentence of 15

years' imprisonment is sufficient but not greater than necessary to achieve the goals of

Section 3553(a).

FINANCIAL PENALTIES AND RESTITUTION

I.      Assessments and Fines

        In addition to assessments imposed by 18 U.S.C. § 3013, the Court should

impose a payment of a $5,000 special assessment pursuant to the Justice for Victims of

Trafficking Act of 2015.[7]  PSR ¶¶ 233.

II.     Restitution

        The Court should order the defendants to pay restitution to the victims jointly

and severally in the amounts set forth below.  Victims of crime have "[t]he right to full and

timely restitution as provided in law," 18 U.S.C. § 3771(a)(6).  In sex trafficking cases, 18

U.S.C. § 1593 provides for mandatory restitution to the victims.  See, e.g., United States v.

Mammedov, 304 Fed. App'x 922, 927, 2008 WL 5411080, at *3 (2d Cir. Dec. 30, 2008)

(unpublished).

        Pursuant to § 1593(b), sex trafficking defendants are required to pay the "full

amount of the victim's losses," which includes the victim's actual losses and "the gross

---

[7]      Although the PSR states that the $5,000 special assessment is to be imposed
"per count," the government notes that the Second Circuit has recently "conclude[d] that the
text of § 3014, taken as a whole and in its context, is . . . meant to be applied on a per-
offender, not a per-count, basis."  United States v. Haverkamp, 958 F.3d 145, 149 (2d Cir.
2020).

income or value to the defendant of the victim's services."[8]  In interpreting this provision, the Second Circuit has unequivocally ruled that sex trafficking victims shall "receive restitution, notwithstanding that their earnings came from illegal conduct."  Mammedov, 304 Fed. App'x at 927; see also United States v. Cortes-Castro, 511 Fed. App'x 942, 947 (11th Cir. Mar. 7, 2013) (unpublished) (rejecting defendant's "preposterous" argument that "restitution rewards victims for their illegal activities" and holding that sex trafficking victims are "entitled to be 'made whole for their losses'").  Additionally, a restitution order under § 1593 "shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A."  Thus, a defendant's "economic circumstances" should have no bearing on a court's decision to enter such an order.  18 U.S.C. § 3664(f)(1)(A); In re Morning Star Packing Co., 711 F.3d 1142, 1144 (9th Cir. 2013) (holding district court committed legal error in denying restitution because of defendant's claimed financial status and potential availability of civil remedies).

The gross value of the victim's services to the defendant is determined by averaging the amount that a victim earned for the defendant for each commercial sex act and the amount of time the defendant forced the victim to engage in commercial sex acts.  United States v. Robinson, 508 Fed. App'x 867, 871 (11th Cir. 2013); In re Sealed Case, 702 F.3d at

---

[8]        Subsection (b)(3) provides for "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act."  In virtually every sex trafficking case, the value of the victim's services is greater than the amount the victim could have earned under the Fair Labor Standards Act.  See, e.g., United States v. Williams, 319 F. Supp. 3d 812, 817 (E.D. Va. 2018) (calculating restitution under § 1593 as both victim's prostitution proceeds, which totaled $119,300, and victim's deprived minimum wages, which totaled $6,102, and ordering the former as the greater of the two amounts), aff'd, 783 F. App'x 269 (4th Cir. 2019).

62 & n.1; United States v. Webster, No. 08-30311, 2011 WL 8478276 (9th Cir. Nov. 28, 2011) (unpublished). Although "such a determination will inevitably involve some degree of approximation," it is "not fatal." In re Sealed Case, 702 F.3d at 66. "[T]he district court's charge is 'to estimate, based upon the facts in the record, the amount of [the] victim's loss with some reasonable certainty," not absolute certainty. Id.; see also United States v. Baston, 818 F.3d 651, 665 (11th Cir. 2016) (holding that courts calculating restitution amounts are entitled to rely on any evidence "bearing 'sufficient indicia of reliability to support its probable accuracy'").

The defendants in this case forced the victims to engage in numerous commercial sex acts virtually every day for extended periods and took all of the proceeds. The trial record established that the defendants earned approximately $17 in profit from each commercial sex act.[9] The number of clients that the victims were required to have sex with varied, with the average number being around 15 to 20. For example, Fabiola testified that she worked double shifts for defendant Rosalio MR and charged $35 for 15 minutes with a client. Daisy stated she charged $40 for 15 minutes of sex and often worked double shifts. Trial Tr. 238-41; 245. Jose Osvaldo MR told Maria Rosalba to charge $35 for fifteen minutes with a client. Trial Tr. 461. Diana was told to charge between $30 and $35 for a 15-minute session. Trial Tr. 1258.

Based on the evidence, the average amount that the victims earned for the defendants each week was $1,190. This very conservative estimate is reached by averaging

---

[9]     Each commercial sex act typically cost the client $35. Of that amount, approximately $17-$18 went to the defendants, and the remainder went to other individuals involved in the prostitution activity, such as drivers.

the number of clients per day at 10 on weekday shifts and 15 on weekend shifts.  Thus, the average number of clients per week was 70 (10 clients x 4 weekdays + 15 clients x 2 weekend nights), and at approximately $17 earned per sex act, the average earned per week was $1,190.

This average is further supported by financial records entered at trial demonstrating that the defendants and their victims sent hundreds of thousands of dollars in prostitution proceeds to family members and associates in Mexico.  See, e.g., Government Exhibits 401-409 (wire transfer records), 412 (wire transfer spreadsheet), 413 (wire transfer chart), 701 (stipulation concerning wire transfer records); Tr. 252-253 (Daisy's testimony), 488 (Maria Rosalba's testimony); 804-805 (Delia's testimony).  Of course, those records do not account for proceeds that remained in the United States or were transferred using different means or for records that were otherwise not located or obtainable during the investigation.

As such, the gross value of the victims' services to the defendants under 18 U.S.C. § 1593 should equal the number of months the defendants forced the victims to prostitute multiplied by $4,760 ($1,190 per week x 4 weeks per month).  Restitution amounts for each victim is set forth below.

The government reserves this right to supplement this request for restitution with additional losses.

    i.   <u>Diana: $28,560</u>

Jose Miguel MR and his co-defendants forced Diana to engage in prostitution for approximately six months, between August 2006 and January 2007.  Using an average of

$4,760 in prostitution proceeds a month, as calculated above, Diana is entitled to $28,560 in restitution ($4,760 x 6 months).

      ii.    <u>Veronica: $371,280</u>

Jose Miguel MR and his co-defendants forced Veronica to engage in prostitution for approximately 78 months, between 2007 and June 2013.  Using an average of $4,760 in prostitution proceeds a month, as calculated above, Veronica is entitled to $371,280 in restitution ($4,760 x 78 months).

      iii.    <u>Fabiola: $357,000</u>

Rosalio MR and his co-defendants forced Fabiola to engage in prostitution for approximately 75 months, between June 2009 and September 2015.  Using an average of $4,760 in prostitution proceeds a month, as calculated above, Fabiola is entitled to $357,000 in restitution ($4,760 x 75 months).

      iv.    <u>Maria Rosalba: $71,400</u>

Jose Osvaldo MR and his co-defendants forced Maria Rosalba to engage in prostitution in the United States for approximately 15 months, between November 2010 and February 2012.  Using an average of $4,760 in prostitution proceeds a month, as calculated above, Maria Rosalba is entitled to $71,400 in restitution ($4,760 x 15 months).

      v.    <u>Delia: $199,920</u>

Francisco MP and his co-defendants forced Delia to engage in prostitution for approximately 42 months, between October 2010 and April 2014.  Using an average of $4,760 in prostitution proceeds a month, as calculated above, Delia is entitled to $199,920 in restitution ($4,760 x 42 months).

vi.    <u>Daisy: $90,440</u>

Fabian RR and his co-defendants forced Daisy to engage in prostitution in the United States for approximately 19 months, between June 2013 and January 2015.  Using an average of $4,760 in prostitution proceeds a month, as calculated above, Daisy is entitled to $90,440 in restitution ($4,760 x 19 months).

CONCLUSION

For the reasons set forth above, the government respectfully submits that the

Court should impose appropriately severe sentences in this case to address the grave harms

these defendants inflicted during their years of operating an extended trafficking network that

victimized young women and girls.

Dated:      Brooklyn, New York
            October 22, 2021

                                   Respectfully submitted,

                                   BREON PEACE
                                   UNITED STATES ATTORNEY
                                   Eastern District of New York
                                   271 Cadman Plaza East
                                   Brooklyn, New York 11201


                          By:      /s/
                                   Tanya Hajjar
                                   Erin A. Argo
                                   Gillian A. Kassner
                                   Assistant United States Attorneys
                                   (718) 254-7000